ORIGINAL

SHAWN N. ANDERSON
United States Attorney
BENJAMIN K. PETERSBURG
Assistant U.S. Attorney
Sirena Plaza, Suite 500
108 Hernan Cortez Avenue
Hagåtña, Guam 96910
PHONE: (671) 472-7332
FAX: (671) 472-7215

Attorneys for the United States of America

FILED
DISTRICT COURT OF GUAM
JUN 15 2020
JEANNE G. QUINATA
CLERK OF COURT

IN THE UNITED STATES DISTRICT COURT

FOR THE TERRITORY OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>INIGO PHILBRICK,<br><br>Defendant. | MAGISTRATE CASE NO. 20-00059<br><br>PETITION FOR WRIT OF REMOVAL |

Petitioner, the United States Attorney for the District of Guam, respectfully shows this Court that:

1. On April 30, 2020, the United States District Court for the Southern District of New York filed a Complaint charging the defendant with one count of Wire Fraud in violation of 18 U.S.C. § 1343 and one count of Aggravated Identity Theft in violation of 18 U.S.C. §1028(a)(1).

2. On April 30, 2020, the United States District Court for the Southern District of New York issued a warrant of arrest for the defendant to be brought to the Southern District of New York to answer to the charges of the complaint. A copy of the complaint and warrant for

PETITION FOR WRIT OF REMOVAL- 1

arrest are attached and incorporated herein as Exhibit 1.

3. On June 12, 2020, the defendant was arrested and transported to Guam.

WHEREFORE, petitioner prays this Court to issue a writ of removal pursuant to Rule 5(c) of the Federal Rules of Criminal Procedure, for said defendant from the District of Guam to the Southern District of New York.

DATED this 15th day of June, 2020.

SHAWN N. ANDERSON
United States Attorney
Districts of Guam and the NMI

By: _____
BENJAMIN K. PETERSBURG
Assistant U.S. Attorney

PETITION FOR WRIT OF REMOVAL- 2

Approved: _____
JESSICA K. FEINSTEIN/CECILIA VOGEL
ASSISTANT UNITED STATES ATTORNEYS

Before: HONORABLE ROBERT W. LEHRBURGER
United States Magistrate Judge
Southern District of New York

20 MAG 4507

--------------------------------- x

**SEALED COMPLAINT**

UNITED STATES OF AMERICA

- v. -

INIGO PHILBRICK,

Defendant.

Violation of
18 U.S.C. § 1343

COUNTY OF OFFENSE:
NEW YORK COUNTY

--------------------------------- X

SOUTHERN DISTRICT OF NEW YORK, ss.:

CHRISTOPHER McKEOGH, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation (the "FBI"), and charges as follows:

COUNT ONE
(Wire Fraud)

1. From in or about 2016 through in or about 2019, in the Southern District of New York and elsewhere, INIGO PHILBRICK, the defendant, together with others known and unknown, knowingly and willfully, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit, for the purpose of financing PHILBRICK's art dealing business, PHILBRICK obtained funds by means of interstate and foreign wire transfer from collectors, investors, and financial lenders by providing false information and false documents regarding the sale, ownership and provenance of artworks.

(Title 18, United States Code, Sections 1343 and 2.)

Exhibit 1 - Page 1

COUNT TWO
(Aggravated Identity Theft)

2. In or about 2017, in the Southern District of New York and elsewhere, INIGO PHILBRICK, the defendant, knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, PHILBRICK used and aided and abetted the use of the name and signature of an officer of a Pennsylvania-based company to create a false and fraudulent art sale contract in connection with the wire fraud offense alleged in Count One of this Complaint.

(Title 18, United States Code, Sections 1028A(a)(1), 1028A(c)(5), and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

3. I am a special agent with the Federal Bureau of Investigation ("FBI"), and have been so employed for approximately seventeen years. I have spent the last six years investigating criminal activity related to artwork and antiquities, including theft, fraud, money laundering, and other crimes involving highly regarded works of art such as paintings, sculptures, and antiquities. I have been personally involved in the investigation of this matter, and I base this affidavit on that personal experience, as well as on my conversations with other law enforcement agents and my examination of various reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause for the offenses cited above, it does not include all the facts that I have learned during the course of the investigation. Where the contents of conversations of others are reported herein, they are reported in substance and in part.

Overview of the Scheme to Defraud

4. Based on my involvement in this investigation, including interviews I have conducted, and my review of emails, business records, law enforcement reports, and publicly available information including legal filings, I have learned the following, in substance and in part:

Exhibit 1 - Page 2

a.  At all times relevant to this Complaint, INIGO PHILBRICK, the defendant, was an art dealer specializing in post-war and contemporary fine art.

b.  At all times relevant to this Complaint, Inigo Philbrick, Ltd. ("Philbrick Entity-1") was a corporate entity controlled by PHILBRICK for the purpose of operating his fine art business, which included an art gallery located in London, United Kingdom, and, beginning in or about 2018, a gallery located in Miami, Florida.

c.  From in or about 2016, up to and including in or about 2019, in order to maintain and finance his art business, PHILBRICK engaged in a scheme to defraud multiple individuals and entities involved in the art market. As part of and in furtherance of the fraudulent scheme, PHILBRICK made material misrepresentations and omissions to art collectors, investors, and lenders in order to procure access to valuable fine art and to obtain sales proceeds, funding, and loans premised on his alleged ownership of fine art. In particular, PHILBRICK knowingly and willfully misrepresented the ownership of certain artworks, for example, by selling a total of more than 100 percent ownership in an artwork to multiple individuals and entities without their knowledge; and by selling artworks and/or using artworks as collateral on loans without the knowledge or permission of co-owners, and without disclosing the ownership interests of third parties to buyers and lenders. As part of the fraudulent scheme, PHILBRICK also furnished fake and fraudulent sale and consignment contracts in order to artificially inflate the value of artworks and to conceal the discovery of his scheme.

The Art Finance Company

5.  Based on my review of emails, business records, including invoices and contracts, bank records, legal filings, and interviews, I have learned the following, in substance and in part:

a.  Beginning in or about 2016, INIGO PHILBRICK, the defendant, began obtaining financing from a specialty lending company engaged in the business of providing loans secured by fine art assets (the "Art Finance Company"). At all times relevant to this Complaint, the Art Finance Company was based in Manhattan, New York.

Exhibit 1 - Page 3

b.  Before extending a loan to a borrower, the Art Finance Company conducted certain due diligence checks on the artwork offered as collateral, including researching the artwork's provenance — *i.e.*, the origin and ownership history of an artwork – and conducting independent appraisals of the value of the artwork. The Art Finance Company would not provide loans unless the borrower was the sole owner of the artwork.

c.  In or about 2017, at the encouragement of the Art Finance Company, PHILBRICK assumed control of a Jersey-based corporate vehicle ("Philbrick Entity-2") for the purpose of holding title to certain art assets that would be used as collateral on loans. PHILBRICK was the "sole beneficial shareholder" of Philbrick Entity-2.

d.  On or about March 31, 2017, Philbrick Entity-2 entered into a loan and security agreement with the Art Finance Company (the "Loan Contract"), whereby, in substance and in part, the Art Finance Company agreed to extend a $10 million revolving credit facility to Philbrick Entity-2 secured by a rotating pool of artworks (the "Collateral Pool") approved by the Art Finance Company. The Loan Contract further provided the following, in substance and in part:

i.  Philbrick Entity-2 was the "sole and absolute lawful and beneficial owner" of the Collateral Pool, and had the authority to transfer "good and marketable title" to the Collateral Pool;

ii.  Philbrick Entity-2 granted a security interest in its right, title, and interest in the Collateral Pool to the Art Finance Company;

iii.  In the event of default, as defined under the Loan Contract, the Art Finance Company would be entitled to sell the Collateral Pool and apply the proceeds to Philbrick Entity-2's debt.

e.  From in or about March 2017 through in or about the fall of 2019, pursuant to the terms of the Loan Contract, PHILBRICK, acting through Philbrick Entity-2, sought and received permission from the Art Finance Company to add and remove various artworks from the Collateral Pool.

Exhibit 1 - Page 4

## Jean-Michel Basquiat's "Humidity"

6. As part of the fraudulent scheme set forth above in paragraph 4(c) of this Complaint, INIGO PHILBRICK, the defendant, made material misrepresentations to various investors and to the Art Finance Company regarding certain artworks that became part of the Collateral Pool, including, as described in greater detail below, a 1982 painting by the artist Jean-Michel Basquiat titled "Humidity" (the "Basquiat"). Based on my review of emails, business records including invoices and contracts, bank records, legal filings, and interviews of certain individuals, I have learned the following, in substance and in part:

    a. In or about 2016, PHILBRICK, through Philbrick Entity-1, purchased the Basquiat in a private sale through an auction house ("Auction House-1") for a total of $12.5 million.

    b. Around the time PHILBRICK purchased the Basquiat, PHILBRICK and an investor ("Investor-1") began discussing jointly acquiring the Basquiat for the purpose of quickly re-selling the Basquiat at a profit. PHILBRICK provided Investor-1 with a contract purporting to show that PHILBRICK had agreed to purchase the Basquiat from a Pennsylvania-based company (the "Pennsylvania Company") for $18.4 million. The contract for sale of the Basquiat was purportedly signed by an officer of the Pennsylvania Company ("Officer-1").

    c. In fact, the contract with the Pennsylvania Company was fake. During the course of this investigation, I interviewed Officer-1. Officer-1 stated, in substance and in part, that Officer-1 did not sign the contract for sale of the Basquiat; that Officer-1 had never heard of the artist Jean-Michel Basquiat, PHILBRICK, or Philbrick Entity-1; and that Officer-1 was unaware of anyone involved in the Pennsylvania Company engaged in the collection or sale of fine art.

    d. PHILBRICK did not disclose to Investor-1 that PHILBRICK had actually purchased the Basquiat through Auction House-1 for $12.5 million.

    e. On or about August 11, 2016, PHILBRICK and Investor-1 entered into a contract to jointly purchase the

Exhibit 1 - Page 5

Basquiat for $18.4 million.[1] The contract provided, in substance and in part, the following:

      i.     Investor-1 would contribute 50 percent of the $18.4 million purchase price of the Basquiat, along with an additional $3 million loan for Philbrick Entity-1 secured against the Basquiat.

      ii.    Investor-1 would take full title to the Basquiat, which would not be transferred or otherwise encumbered.

     f.    In or about August and September 2016, Investor-1 wired a total of $12.2 million to a bank account for Philbrick Entity-1 as payment for the Basquiat.

     g.    On or about November 1, 2016, PHILBRICK agreed to sell an ownership stake in the Basquiat to a London-based art dealer and collector ("Investor-2") for $2.75 million. The invoice issued by Philbrick Entity-1 to Investor-2 for the ownership stake in the Basquiat recorded a "[p]urchase of 12.5% of the [Basquiat], reflecting a preferred stake paying 25% of profit above the joint acquisition price of 22,000,000 USD."[2] PHILBRICK did not inform Investor-1 of his agreement to sell Investor-2 an interest in the Basquiat.

     h.    In or about March 2017, a representative of PHILBRICK ("Representative-1") told the Art Finance Company that PHILBRICK would like to add the Basquiat to the Collateral Pool. During the course of communications with the Art Finance Company regarding the Basquiat, PHILBRICK never disclosed the interests of Investor-1 or Investor-2 in the Basquiat. For example:

      i.     On or about March 28, 2017, PHILBRICK caused an email to be sent to the Art Finance Company including, among other things, the bill of sale showing that Philbrick Entity-1 had purchased the Basquiat for $12.5 million from

---

[1] Investor-1 contracted with Philbrick Entity-1 on behalf of a corporate entity controlled by the family of Investor-1.

[2] It is unclear, based on currently available information, why the invoice Philbrick Entity-1 issued to Investor-2 noted a $22 million joint acquisition price for the Basquiat.

Exhibit 1 - Page 6

Auction House-1 in 2016; and a list of the provenance and exhibition history for the Basquiat. According to the provenance list, the current owner of the Basquiat was a "Private Collection, England." On or about April 7, 2017, the Art Finance Company sent an email to PHILBRICK asking him to clarify the identity of the English collector. In response, PHILBRICK confirmed that he was the English collector, and that "I prefer to be identified as a private collection for things I intend to hold on to."

      ii.  On or about March 31, 2017, a representative of the Art Finance Company emailed PHILBRICK, asking him to disclose "which artworks (by artist, title, year) held in [Philbrick Entity-1] have a shared ownership with a third-party equity partner?" In response, PHILBRICK provided a short list of artworks owned with partners, which did not include the Basquiat.

      iii.  On or about April 7, 2017, PHILBRICK emailed the Art Finance Company an invoice showing the transfer of title to the Basquiat from Philbrick Entity-1 to Philbrick Entity-2, in preparation for the Basquiat to be added to the Collateral Pool. The invoice did not reference any ownership interest of Investor-1 or Investor-2.

      i.  In or about April 2017, the Art Finance Company approved the addition of the Basquiat to the Collateral Pool for the Loan Contract. As part of the transaction, the Art Finance Company provided PHILBRICK, through Entity-1, with an additional $3.25 million in financing, which funds were dispersed via wire transfer from the Art Finance Company's bank account in New York, New York to Philbrick Entity-2's bank account in Jersey, United Kingdom.

<u>Christopher Wool's "Untitled" (2010)</u>

  7. As part of the fraudulent scheme set forth above in paragraph 4(c) of this Complaint, INIGO PHILBRICK, the defendant, made material misrepresentations to various investors and to the Art Finance Company regarding another artwork in the Collateral Pool, a 2010 untitled painting by the artist Christopher Wool (the "Wool"). Based on my review of emails, business records including invoices and contracts, bank records, legal filings, and interviews of certain individuals, I have learned the following, in substance and in part:

Exhibit 1 - Page 7

a. On or about November 28, 2017, PHILBRICK, by and on behalf of Philbrick Entity-1, entered into a sales and marketing agreement (the "Marketing Contract") with an art investor ("Investor-3"). The Marketing Contract provided, in substance and in part, that Philbrick Entity-1 agreed to purchase several artworks, including the Wool, on behalf of Investor-3, and then to market and sell those artworks for Investor-3.

b. An invoice dated April 24, 2018, shows that on or about that date, Philbrick Entity-1 purchased the Wool for $4.175 million from an art gallery in Manhattan (the "Manhattan Gallery").

c. On or about June 25, 2018, PHILBRICK and Investor-3 agreed that PHILBRICK would obtain the Wool under the terms of the Marketing Contract and on behalf of Investor-3 for $6.9 million (the "Purchase Agreement"). The Purchase Agreement contains no reference to Philbrick Entity-1's purchase of the Wool for $4.175 million from the Manhattan Gallery, as described in paragraph 6(b), above. On or about September 14, 2018, Philbrick Entity-1 issued a $6.9 million purchase invoice for the Wool to Investor-3.

d. On or about July 11, 2018, Philbrick Entity-1 sold three ownership interests in the Wool, purportedly totaling approximately 80 percent ownership of the Wool, to three other investors ("Investor-4," "Investor-5," and "Investor-6") for $1.2 million each. PHILBRICK did not disclose the sale of these ownership interests to Investor-3.

e. Beginning in or about September 2018, PHILBRICK and the Art Finance Company began discussing the possibility of PHILBRICK adding the Wool to the Collateral Pool for the Loan Contract in exchange for, among other things, receiving an additional $1.75 million in financing. During the course of those communications, PHILBRICK never disclosed to the Art Finance Company the ownership interests of Investor-3, Investor-4, Investor-5, and Investor-6 in the Wool, or that he had already sold more than 100 percent ownership interest in the Wool to third parties. For example:

i. In or about September 2018, Representative-1 emailed the Art Finance Company, in substance and in part, that PHILBRICK would like to swap "a large Christopher Wool [that PHILBRICK] recently acquired" for another

Exhibit 1 - Page 8

artwork in the Collateral Pool. Representative-1 further stated, in substance and in part, that the Wool was purchased for $4.175 million from the Manhattan Gallery, and did not mention the subsequent agreements with Investor-3, Investor-4, Investor-5, and Investor-6.

ii. On or about September 12, 2018, Representative-1 emailed the Art Finance Company with a provenance history for the Wool, listing the Manhattan Gallery and another individual as prior owners. The email did not disclose the ownership interests of Investor-3, Investor-4, Investor-5, or Investor-6.

iii. On or about October 30, 2018, Philbrick Entity-1 transferred title to the Wool to Philbrick Entity-2 in preparation for adding the Wool to the Collateral Pool; Representative-1 then emailed the Art Finance Company the invoice reflecting the transfer of title to Philbrick Entity-2; the invoice did not reference the ownership interests of Investor-3, Investor-4, Investor-5, or Investor-6.

f. On or about October 31, 2018, the Art Finance Company agreed to add the Wool to the Collateral Pool. As part of the exchange in which the Wool was added to the Collateral Pool, the Art Finance Company provided PHILBRICK with another $1.75 million loan, which funds were dispersed to Philbrick Entity-2 by means of wire transfer from the Art Finance Company's bank account in Manhattan to Philbrick Entity-2's bank account in Jersey, United Kingdom.

<u>Rudolf Stingel's "Picasso"</u>

8. As part of the fraudulent scheme described in paragraph 4(c) of this Complaint, and as set forth in greater detail below, INIGO PHILBRICK, the defendant, agreed to sell or transfer ownership interests in an untitled 2012 painting by the artist Rudolf Stingel depicting the artist Pablo Picasso (the "Stingel") to multiple investors. Based on my review of business records, including invoices and contracts, bank records, legal filings, and interviews, I have learned the following, in substance and in part:

a. Between in or about January 2016 and in or about June 2017, PHILBRICK sold full or partial ownership interests in the Stingel, totaling more than 100 percent ownership, to three investors: Investor-1, Investor-3, and

Exhibit 1 - Page 9

another investor ("Investor-7"). Investor-1, Investor-3, and Investor-7, who paid or agreed to pay PHILBRICK a total of more than $15 million for the Stingel, were unaware of each other's respective claims to the Stingel.

b. PHILBRICK sold the Stingel to Investor-3 as part of an agreement whereby Philbrick Entity-1 would purchase the Stingel on behalf of Investor-3, and then market and sell the painting on Investor-3's behalf. An invoice dated February 29, 2016 shows that Philbrick Entity-1 charged Investor-3 $7.1 million for the Stingel. Investor-3 and Philbrick Entity-1 then agreed on a target re-sale price for the Stingel of $9 million.

c. In or about 2019, Investor-7, which had physical possession of the Stingel, consigned the Stingel to an auction house in Manhattan ("Auction House-2") for sale in a May 2019 auction (the "May 2019 Auction"). PHILBRICK and Philbrick Entity-1 were not parties to the consignment agreement.

d. Thereafter, PHILBRICK falsely told Investor-3, in substance and in part, that Auction House-2 had entered into a consignment agreement with PHILBRICK on behalf of Investor-3 to sell the Stingel in the May 2019 Auction, with a guaranteed minimum sales price of $9 million.

e. Before the May 2019 Auction, PHILBRICK entered into an agreement with the Manhattan Gallery to bid on PHILBRICK's behalf on the Stingel during the May 2019 Auction. On or about May 15, 2019, PHILBRICK sent an email to the Manhattan Gallery, directing the Manhattan Gallery to bid up to $7.2 million on the Stingel.

f. During the May 2019 Auction, the Manhattan Gallery made a winning bid of $5.5 million on the Stingel. On or about May 20, 2019, Auction House-2 emailed the Manhattan Gallery an invoice for its purchase of the Stingel. The Manhattan Gallery forwarded the invoice to PHILBRICK.

g. Following the May 2019 Auction, Investor-3 requested that PHILBRICK provide proof that he had consigned the Stingel to Auction House-2 as previously represented. PHILBRICK gave Investor-3 a copy of what appeared to be a consignment agreement for the Stingel between Auction House-2 and Philbrick Entity-1, with a $9 million guarantee. However, based on my communications with Auction House-2, I have learned, in

Exhibit 1 - Page 10

substance and in part, that the consignment agreement PHILBRICK provided to Investor-3 is fraudulent.

h.  In or about July and August 2019, Philbrick Entity-1 wired two payments totaling approximately $2 million from Philbrick Entity-1's bank account in the United Kingdom to the Manhattan Gallery's bank account located in Manhattan. The Manhattan Gallery then made two equivalent payments to Auction House-2 as partial payment for the Stingel. Auction House-2 never received any further payments for the Stingel.

## The Scheme Unravels

9.  In or about the fall of 2019, the fraudulent scheme perpetrated by INIGO PHILBRICK, the defendant, began to unravel as PHILBRICK's unpaid debts mounted and various investors began demanding the return of their investments or artworks. For example, based on my review of publicly emails and business records, legal filings, and interviews of certain individuals, I have learned the following, in substance and in part:

a.  In or about September and October 2019, Investor-1 and Investor-3 learned that PHILBRICK had provided them with fraudulent sales contracts related to the Basquiat and the Stingel, respectively.

b.  In or about October 2019, PHILBRICK asked the Art Finance Company, in substance and in part, what would happen if he defaulted on his loan. Later that month, PHILBRICK admitted to the Art Finance Company, in substance and in part, that PHILBRICK was not the sole owner of the Basquiat, the Wool, and another painting in the Collateral Pool, and began trying to negotiate a payment plan or settlement of the Art Finance Company's claims with the respective co-owners of the art works. On or about October 14, 2019, the Art Finance Company sent PHILBRICK an official notice of default on the Loan Contract.

c.  By November 2019, Investor-1, Investor-3, Investor-7, and several other individuals and entities, had filed civil lawsuits in multiple jurisdictions claiming, in substance and in part, that PHILBRICK had sold artworks without the knowledge or permission of the owners of those artworks, and/or used artworks as collateral for loans without the knowledge or permission of the owners and without disclosing third-party ownership interests.

Exhibit 1 - Page 11

10. Based on my review of flight records and my review of public information, I know that INIGO PHILBRICK, the defendant, left the United States shortly before news broke about the lawsuits, and that his galleries in Miami and London are now closed. PHILBRICK ceased communications with the Art Finance Company, and stopped responding to legal process.

WHEREFORE, deponent respectfully requests that a warrant be issued for the arrest of INIGO PHILBRICK, the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

S/ by the Court with consent
_____
CHRISTOPHER MCKEOGH
SPECIAL AGENT
Federal Bureau of Investigation

Sworn to me by reliable electronic means this
30 day of April, 2020

_____
THE HONORABLE ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

Exhibit 1 - Page 12

# UNITED STATES DISTRICT COURT
for the

Southern District of New York

| United States of America | ) |  |
|---|---|---|
| v. | ) | Case No. |
|  | ) |  |
| Inigo Philbrick | ) | **20 MAG 4507** |
|  | ) |  |
|  | ) |  |
| *Defendant* |  |  |

## ARREST WARRANT

To:    Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay

*(name of person to be arrested)*    Inigo Philbrick                                                                ,
who is accused of an offense or violation based on the following document filed with the court:

☐ Indictment   ☐ Superseding Indictment   ☐ Information   ☐ Superseding Information   ☐ Complaint

☐ Probation Violation Petition   ☑ Supervised Release Violation Petition   ☐ Violation Notice   ☐ Order of the Court

This offense is briefly described as follows:

Violations of 18 U.S.C. §§ 1343, 1028A


Date:    04/30/2020

*Issuing officer's signature*

City and state:    New York, NY            Hon. Robert W. Lehrburger USMJ

*Printed name and title*

| Return |
|---|
| This warrant was received on *(date)* _____, and the person was arrested on *(date)* _____ at *(city and state)* _____. |
| Date: _____    _____ *Arresting officer's signature*   _____ *Printed name and title* |

Exhibit 1 - Page 13